Beth E. Terrell, WSBA #26759
Blythe H. Chandler, WSBA #43387
Brittany J. Glass, WSBA #52095
Attorneys for Plaintiff
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450
Email: bterrell@terrellmarshall.com
Email: bchandler@terrellmarshall.com
Email: bglass@terrellmarshall.com

David C. Silver, *pro hac vice motion forthcoming*
Jason S. Miller, *pro hac vice motion forthcoming*
Attorneys for Plaintiff
SILVER MILLER
11780 West Sample Road
Coral Springs, Florida 33065
Telephone: (954) 516-6000
Email: DSilver@SilverMillerLaw.com
Email: JMiller@SilverMillerLaw.com

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| MARK MOSS, an individual; | NO. |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY DEMAND** |
| GIGA WATT, INC., a Washington corporation; and GIGA WATT, PTE, LTD., a foreign corporation; | |
| Defendants. | |

COMPLAINT - 1

1    Plaintiff MARK MOSS, an individual ("Plaintiff"), by and through

2  undersigned counsel, hereby sues GIGA WATT, INC., a Washington corporation;

3  and GIGA WATT, PTE, LTD., a foreign corporation (collectively "GIGA

4  WATT" or "Defendants"), for damages and for equitable relief. In support

5  thereof, Plaintiff alleges as follows:

6                          **PRELIMINARY STATEMENT**

7    1.    This action is brought by Plaintiff, an investor who contributed more

8  than half-a-million dollars' worth of cryptocurrency (bitcoin, Ether, and Litecoin)

9  and fiat currency during an Initial Coin Offering (ICO) in or about June 2017 −

10  August 2017 propagated by Defendants − a contribution that, due to the rising

11  value of the cryptocurrency that Plaintiff invested, is now valued at nearly

12  $1,500,000.00.

13    2.    Defendants spent months promoting interest in their purported

14  development of a full-service, turnkey processing center to house high-capacity

15  cryptocurrency mining equipment in the state of Washington that would provide

16  miners a "full range of mining services from hosting, maintenance, and repair to

17  private blockchain servicing" (the "Giga Watt Project"). The state of Washington

18  was chosen as the site of the Giga Watt Project because, *inter alia*, it has one of

19  the lowest electricity costs to consumers in the world.

20

3.       Defendants also promoted to investors that, hand-in-hand with hosting and maintaining mining equipment, Defendants would provide interested investors − for a separate investment of cryptocurrency − "purchase and delivery of mining equipment [and related power supplies] through [GIGA WATT, PTE LTD.] with its subsequent setup and hosting at Giga Watt's facilities in Wenatchee, WA."

4.       At the time Plaintiff made his investment, the Giga Watt Project was not fully developed or functional.

5.       For each investment of cryptocurrency or fiat currency in GIGA WATT prior to the launch of the Giga Watt Project, the investor would be given either: (a) Ethereum-based cryptocurrency tokens called Giga Watt tokens ("WTT") which were newly-created by Defendants and which represented the exclusive right to use the Giga Watt Project's capacity rent-free for 50 years, or (b) mining equipment and related power supplies to be set up and deployed by the GIGA WATT team at the site of the Giga Watt Project.

6.       The investor would not be given his/her/its Giga Watt tokens or machinery, however, until Defendants released a specific batch of the tokens or machinery, based on how far along the Giga Watt Project was in its development and functionality. Giga Watt tokens were not scheduled to be released by Defendants to the investors any earlier than July 15, 2017, though the more likely

1  initial release date was August 7, 2017 − about a week after the ICO had

2  concluded. As such, each investor in the ICO was given nothing more for

3  his/her/its investment than the future right to receive, on some anticipated date, a

4  number of Giga Watt tokens or machinery commensurate with the investor's

5  investment that would then allow the investor access to the yet-to-be-developed

6  Giga Watt Project.

7      7.      At the time of the ICO, the WTT were valued at approximately $1.00

8  - $1.20 per WTT, though Defendants purported that value would skyrocket once

9  the Giga Watt Project was fully developed and functional.

10     8.      To induce interest and investments in the Giga Watt Project, and to

11  maintain interest amongst concerned investors after development of the Giga

12  Watt Project had languished beyond acceptable timeframes, several GIGA

13  WATT representatives have overtly and unmistakably stated to investors that

14  between the time of the ICO and the date on which each investor would be issued

15  his/her/its Giga Watt tokens, the value/price of each Giga Watt token was

16  anticipated to increase significantly. Moreover, GIGA WATT represented that the

17  appreciation in value of the Giga Watt tokens would not be the only income-

18  producing avenue open to GIGA WATT investors as a by-product of their

19  investments, *to wit*:

20

COMPLAINT - 4

(a)    GIGA WATT Chief Executive Officer recently published and disseminated to GIGA WATT investors a newsletter in which GIGA WATT touted several "of the new income opportunities Giga Watt will bring to its WTT holders in 2018"; and

(b)    GIGA WATT's in-house General Counsel (at the time) Zeev Kirsh, on GIGA WATT's behalf, represented that by the time GIGA WATT completes its entire build-out, the "anticipated value/price of the tokens will likely climb quite a bit."

9.    Giga Watt tokens allegedly derive their value from the usefulness, availability, functionality, and popularity of the Giga Watt Project − development and launch of which was and is entirely in Defendants' control.

10.    Moreover, Defendants held within their sole control the ability to determine when the Giga Watt Project was far enough along in its development for Giga Watt tokens and machinery to be issued to investors. Investors were, and still are, at Defendants' mercy with regard to when, if ever, the investors would be issued their Giga Watt tokens and machinery.

11.    As of the date of this filing, the Giga Watt Project is purportedly still being developed and, upon information and belief, might never be fully launched.

12.    Many investors have not been issued their Giga Watt tokens or had their machines set up and deployed, fear that they might never be issued their tokens or see their mining machines activated, and are losing valuable time and

1   money as Defendants indefinitely delay the further development of the Giga Watt

2   Project.

3        13.    Additionally, Defendants have represented that virtually all of the

4   cryptocurrency raised from investors in the ICO has been converted to cash,

5   released from escrow, and was put into a GIGA WATT operating account −

6   which Plaintiff reasonably believes means that the funds raised have been

7   dissipated, or will be dissipated, before the investors receive their Giga Watt

8   tokens/mining equipment or any opportunity to receive a return on their

9   investments.

10       14.    The GIGA WATT investors, including Plaintiff, invested in a

11  common enterprise and with an expectation that their investments would increase

12  in value and produce for them a substantial return − all pivotal occurrences that

13  would be derived solely from the efforts of others, namely Defendants.

14       15.    In short, the thing for which Plaintiff invested his valuable assets

15  looks like a security, functions like a security, and fits the definition of a security.

16  Securities regulators look beyond the form or label someone appends to his/her/its

17  activity and instead consider the actual substance and purpose of the activity.

18       16.    Notwithstanding Defendants' attempts to avoid governmental and

19  private scrutiny, it is clear that Plaintiff was indeed a profit-seeking investor in a

20

1    security and that Defendants promoted and conducted an unregistered offering of

2    securities.

3        17.    Defendants appear to have already pocketed for themselves large

4    sums of money for their promotional efforts, and − due to the many

5    misrepresentations, factual omissions, unwarranted delays, and unlawful activities

6    engaged in by Defendants − it appears Plaintiff will not, and potentially cannot,

7    see any meaningful return on his investments.

8        18.    In describing ICOs as a "fertile ground for fraud on investors,"

9    United States Securities and Exchange Commission (SEC) Chairman Jay Clayton

10    recently said: "[I]nvestors often do not appreciate that ICO insiders and

11    management have access to immediate liquidity, as do larger investors, who may

12    purchase tokens at favorable prices. Trading of tokens on these platforms is

13    susceptible to price manipulation and other fraudulent trading practices."[1] Mr.

14    Clayton went on to state: "The SEC may not yet have policy or rulemaking

15    answers in these areas, but we are on the lookout for ways to fight the type of

16    opacity that can create an environment conducive to misconduct."

17

18

_____

19    [1] Jay Clayton, *Governance and Transparency at the Commission and in Our
     Markets*, Remarks at the PLI 49th Annual Institute on Securities Regulation -
20    New York, NY (November 8, 2017), https://www.sec.gov/news/speech/speech-
     clayton-2017-11-08.

COMPLAINT - 7

1    19.    Moreover, when Chairman Clayton testified in February 2018 before

2  a U.S. Senate committee on the subject of cryptocurrency and ICOs, his

3  expression of the SEC's views on ICOs were even more pointed:

> Certain market professionals have attempted to highlight the utility or voucher-like characteristics of their proposed ICOs in an effort to claim that their proposed tokens or coins are not securities. Many of these assertions that the federal securities laws do not apply to a particular ICO appear to elevate form over substance. The rise of these form-based arguments is a disturbing trend that deprives investors of mandatory protections that clearly are required as a result of the structure of the transaction. Merely calling a token a "utility" token or structuring it to provide some utility does not prevent the token from being a security. Tokens and offerings that incorporate features and marketing efforts that emphasize the potential for profits based on the entrepreneurial or managerial efforts of others continue to contain the hallmarks of a security under U.S. law. It is especially troubling when the promoters of these offerings emphasize the secondary market trading potential of these tokens, *i.e.*, the ability to sell them on an exchange at a profit. In short, prospective purchasers are being sold on the potential for tokens to increase in value – with the ability to lock in those increases by reselling the tokens on a secondary market – or to otherwise profit from the tokens based on the efforts of others. These are key hallmarks of a security and a securities offering.[2]

---

[2] Jay Clayton, *Chairman's Testimony on Virtual Currencies: The Roles of the SEC and CFTC*, Testimony before U.S. Senate Committee on Banking, Housing, and Urban Affairs (February 6, 2018), https://www.sec.gov/news/testimony/testimony-virtual-currencies-oversight-role-us-securities-and-exchange-commission.

1        20.    In a well-written March 12, 2018 article authored by a team of

2  attorneys at Wilson Sonsini Goodrich & Rosati − one of the leading law firms in

3  the United States advising blockchain and cryptocurrency promoters on how best

4  to comply with SEC requirements − it is clear that the legal community

5  understands, and has understood for some time now, what the SEC wants and

6  expects from ICO issuers and the crypto community at-large[3]:

> There has, apparently, been significant shock and surprise over recent reports that the Securities and Exchange Commission (SEC) has issued a large number of subpoenas to initial coin offering (ICO) issuers and to ICO gatekeepers who may have been involved in token transactions that potentially did not comply with the federal securities laws.
>
> To a large extent, this shock and surprise is shocking and surprising.
>
> The <u>SEC</u> has been as clear as it knows how to be that virtually all tokens (and simple agreements for future tokens, or SAFTs) are securities for purposes of the federal securities laws.
>
>       \*         \*         \*
>
> In any event, the crypto community is now on full notice that the SEC will focus on prior token and SAFT offerings that did not comply with the federal securities laws; and it can generally seek disgorgement and money penalties for such misconduct that occurred within the last five years. The SEC also will insist that all token

---

[3] Tyler Kirk, Amy Caiazza, and Robert Rosenblum, "ICO Issuers: Fix the Problem Before the SEC Fixes It For You," *CoinDesk*, March 12, 2018, https://www.coindesk.com/ico-issuers-fix-problem-sec-fixes.

issuers comply with applicable federal securities laws as they develop their platforms and token markets.

The good news is that none of this means that cryptocurrencies and platforms cannot operate in the US. They can, but they need to do so in compliance with the federal securities laws (and other applicable laws and regulations).

There also should no longer be confusion about what the SEC thinks. The SEC thinks that virtually all tokens are securities, and it thinks that all applicable securities laws, rules and regulations apply to tokens and token platforms. This is, after all, precisely what SEC Chairman Clayton and others at the SEC have been saying.

*             *             *

For token issuers that have already made offerings that do not comply with the federal securities laws, for token consultants and distributors that may have been acting as unregistered broker-dealers, and for trading markets that may have been acting as unregistered exchanges, it is time to address these issues.

Going forward, many token issuers will undoubtedly find that the federal securities laws, as applied to tokens and token platforms, are clunky and cumbersome, and not well-tailored to their activities. Registration statement forms were not developed with tokens and the blockchain in mind, periodic reporting requirements were not developed with ICO issuers and platforms as the reporting parties in mind, the securities trading rules were not developed with token platforms in mind, and the regulations governing securities exchanges and markets were not developed with cryptocurrency in mind.

Nonetheless, the federal securities laws still apply.

21.     In addition to the SEC's mandates in this area, the Financial Crimes Enforcement Network (FinCEN) − a division of the United States Treasury Department − has recently declared that any developer that sells convertible virtual currency, including in the form of ICO coins or tokens, in exchange for another type of value that substitutes for currency is a "money transmitter" subject to proper registration with the Treasury Department, anti-money laundering rules, and other regulatory and licensing requirements. Upon information and belief, GIGA WATT has not satisfied its requirements as a "money transmitter."

22.     Proof of Defendants' deceptive activity and intentional deprivation of investors' rights and protections under the federal securities laws is not required or determinative as to Plaintiff's claims. That is because Defendants are strictly liable for offering and selling unregistered securities. Nevertheless, Defendants' deceptive advertisements, blogs, and investor updates are outlined below to stress the urgency and need for immediate judicial intervention to preserve Plaintiff's significant financial interests which Defendants currently control, and to rectify existing and future irreparable harm to Plaintiff and other investors.

COMPLAINT - 11

23.     Plaintiff seeks compensatory and equitable relief rescinding his investments in GIGA WATT and restoring to him the assets and funds he was induced into investing.

## GENERAL ALLEGATIONS

## THE PARTIES

## Plaintiff

24.     Plaintiff is an individual domiciled in San Clemente, California and is *sui juris*. Between June 2, 2017 and August 21, 2017, Plaintiff transmitted to Defendants 9.785386 bitcoin, 322.605305 Ether, 4,056.28 Litecoin, and $241,890.00 (USD) in fiat currency as his investments in GIGA WATT, broken down thusly: (a) 3.513386 bitcoin and 322.605305 ether invested for the disbursement of 60,282 WTT tokens, and (b) 6.272 bitcoin, 4,056.28 Litecoin, and $241,890.00 (USD) for 129 Antminer D3 machines, 60 L3+ machines, related power supplies, and deployment/setup fees. Plaintiff's bitcoin, Ether, Litecoin, and fiat currency (now being held, in one form or another, by Defendants) are currently worth nearly $1,500,000.00.

25.     Plaintiff presented to Defendants several written demands that Plaintiff's investments in GIGA WATT be addressed and/or rescinded by GIGA WATT − a demand that Plaintiff repeated on numerous occasions, including a March 1, 2018 demand written on Plaintiff's behalf by undersigned counsel.

26.    As of the date of this filing, Defendants have failed to provide a meaningful response to Plaintiff's demand and instead seem intent on merely stalling for time despite having violated the terms of their own White Paper and having refused to adhere to their own terms for an investor remedy.

## Defendants

27.    Defendant GIGA WATT, INC. is a Washington corporation with its principal place of business in Wenatchee, Washington. Upon information and belief, GIGA WATT, INC. is currently controlled by its founder, Dave Carlson.

28.    Defendant GIGA WATT PTE, LTD. is a foreign for-profit corporation which lists its principal place of business in Singapore. GIGA WATT PTE, LTD. sold to investors mining equipment and related power supplies that could be installed and hosted at the Giga Watt Project's business site(s) in Washington. Upon information and belief, GIGA WATT PTE, LTD. is currently controlled by Dave Carlson.

29.    Upon information and belief, GIGA WATT, INC. and GIGA WATT PTE, LTD. are alter egos of one another and are operated by Dave Carlson, who continues to operate the businesses through the present day while ignoring all corporate formalities and using the two companies interchangeably as mere instrumentalities for his personal interests in an attempt to shield himself from personal liability for his wrongful conduct.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

**Other Liable Persons/Entities**

30.     In addition to those persons and entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiff, but respecting whom Plaintiff currently lacks specific facts to permit it to name such person or persons as a party defendant. By not naming such persons or entities at this time, Plaintiff is not waiving its right to amend this pleading to add such parties, should the facts warrant adding such parties.

**JURISDICTION AND VENUE**

**Subject Matter Jurisdiction**

31.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest, costs and attorneys' fees, and is an action between citizens of different states.

32.     This Court has supplemental jurisdiction over the Washington state law claims under 28 U.S.C. § 1367(a) because these claims are so related to this action that they form part of the same case or controversy.

**Personal Jurisdiction**

33.     This Court has personal jurisdiction over Defendants because: (a) at least one Defendant is operating, present, and/or doing business within this

COMPLAINT - 14

1   District, and (b) Defendants' breaches and unlawful activity occurred within this

2   District.

3        34.    Defendants solicited investors in this jurisdiction, including Plaintiff,

4   to participate in the Giga Watt Project − reaping from those investors large sums

5   of money and other assets, including valuable cryptocurrency.

6        35.    In light of the foregoing, Defendants purposefully availed

7   themselves of the benefits of operating in this jurisdiction; and this Court may

8   exercise personal jurisdiction over Defendants.

9                        **Venue**

10       36.    Venue is proper pursuant to 28 U.S.C. § 1391 in that a substantial

11   part of the events or omissions giving rise to the claims set forth herein occurred

12   in this judicial district, as GIGA WATT, INC. resides in Washington and the

13   Giga Watt Project has its mining facilities located in Washington.

14       37.    In light of the foregoing, this District is a proper venue in which to

15   adjudicate this dispute.

16        **FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS**

17               **Cryptocurrency Coin Mining**

18       38.    Unlike fiat currency such as U.S. dollars or Euros − which are

19   printed by governmental entities − cryptocurrency comes into existence in the

20

1  decentralized, self-regulated world of cryptocurrency through the dogged work of

2  individuals or entities known as miners.

3      39.    Bitcoin mining is the process by which transactions are verified and

4  added to the public ledger, known as the blockchain, and also is the means

5  through which new bitcoin are released.

6      40.    While anyone with access to the internet and suitable hardware can

7  participate in mining, the work is difficult and the hardware − along with the

8  electricity required to operate that hardware − is oftentimes expensive.

9      41.    The mining process involves compiling recent transactions into

10  blocks and trying to solve a computationally difficult algorithmic puzzle. This

11  work typically requires several computers working together to be running 24

12  hours a day.

13      42.    The miner who first solves the puzzle gets to place the next block on

14  the blockchain and claim the rewards for his/her/its efforts.

15      43.    The rewards, which incentivize mining, are both the transactional

16  fees associated with the transactions compiled in the block as well as the newly-

17  released bitcoin, of which there is only a finite number that can ever exist in the

18  world.

19

20

44.     Mining cryptocurrency today holds much of the same allure that drew gold prospectors to California in the late-1840s. If the mining is successful, great wealth can be amassed in a short amount of time.

### The Giga Watt White Paper

45.     In or about May 2017, GIGA WATT published its White Paper, setting forth the terms of its scheduled ICO and what participants should expect for investing in the Giga Watt Project.

46.     According to the GIGA WATT White Paper, the following is the substance of the Giga Watt Project:

> The Giga Watt Project is built in partnership between Giga Watt, Inc. a U.S. company ("Giga Watt" or "Company"), which offers mining hosting services at its Wenatchee, WA facilities, and GigaWatt Pte. Ltd., a Singapore company ("Partner"), which sells mining equipment to customers worldwide.
>
> *          *          *
>
> Giga Watt's standard turnkey solution includes purchase and delivery of mining equipment through its Partner with its subsequent setup and hosting at Giga Watt's facilities in Wenatchee, WA, with hosting fees starting as low as 7.5 USD cents/kW/hour, zero setup fees (for equipment purchased through its Partner) and uniquely low minimum facility entrance threshold of 1 miner of any model.

47.     Under the section labeled "Payment Terms," the White Paper provides the following, in pertinent part:

1

> All funds collected through the pre-sale and [the ICO]
> will be deposited in escrow. Original payments made in

2

> BTC and ETH will be converted to USD at the rate effective
> at the time when the rights to WTT tokens were reserved.

3

> The funds will be released from escrow in step with the

4

> completion of facilities.

5        48.    According to a statement subsequently published by Andrey

6    Kuzenny (GIGA WATT's Chief Coordinator) on one of GIGA WATT's online

7    support channels, all of the funds converted to USD were originally placed into

8    an escrow account maintained by the Seattle, Washington-based international law

9    firm Perkins Coie.

10       49.    As for what the mining facilities ("pods") would look like, the

11   projected timeline of the development of the Giga Watt Project, and when each

12   investor should expect to receive his/her/its Giga Watt tokens and mining

13   equipment, the White Paper provided the following projected images:

14

15



16

17

18

19

20

COMPLAINT - 18

*Size: 12'x48'*
*Independent fiber-optic Internet connection*

High-pressure fans constantly circulate fresh air through the pod. Filtered air intakes are positioned on one side, with exhaust fans on the other. Rain and snow "fallout area" provides cool shade at intake. Shade placement of transformers ensures higher efficiency and better longevity.

and further set forth the following timeline:

**Projected Construction Timeline**
3 units, 2.25 MW are available right now

[Batch 1]
- July 15, 2017: 1 Giga Pod completed, 0.75 MW

[Batch 2]
- August 1, 2017: 2 Giga Pods completed, 2.4MW

- August 15, 2017: Expansion of the unit, 0.9 MW

[Batch 3]
- September 1, 2017: 3 Giga Pods completed, 4.5 MW

[Batch 4]
- September 15, 2017: 9 Giga Pods completed, 15 MW

[Batch 5]
- October 1, 2017: 3 Giga Pods completed, 4.5 MW

[Batch 6]
- November 15, 2017: 3 Giga Pods completed, 4.2 MW

Plaintiff, for example, found himself in Batches 3 and 4, based upon when he made his investments.

50.    With regard to the risks involved in the ICO, GIGA WATT's White Paper states:

> Construction timeline specified in this White Paper is based on the reasonable estimates but is not guaranteed. This timeline may change, and the construction may be delayed because of many factors, including those beyond Giga Watt's control, such as the actions of third parties (contractors, suppliers, etc.). **If the completion of the capacities is delayed by more than 3 months from the projected date, and, consequently, the relevant WTT tokens are not issued, the escrow agent may issue a refund at the request of the WTT token purchasers. The refund will be issued in the original form of payment at the exchange rate on the date of the refund.**

(emphasis added).

51.    Finally, lest it be unclear that the GIGA WATT management team and its business partners were seeking to obtain as much compensation for their promotional efforts as they could manufacture, the White Paper reveals that the GIGA WATT insiders would distribute to themselves additional tokens for every 100 WTT sold during either the ICO pre-sale or the ICO itself:

> For every 100 tokens **sold**, 15 additional tokens will be issued and retained for the team, partners and advisors: 10 tokens to be distributed to team members, and 5 to be

COMPLAINT - 20

retained for distribution to partners and advisors at [GIGA WATT's] discretion.[4]

52.    The subtle inclusion of the self-determined bonuses for GIGA WATT insiders is common in the emerging, and largely unchecked, self-serving world of ICO fundraising.

53.    As noted above, SEC Chairman Jay Clayton warns that fundraising efforts in exchange for tokens issued for start-up or open-source projects are ripe for misconduct − especially because "insiders and management have access to immediate liquidity, as do larger investors."

54.    The one-sided terms imposed upon Plaintiff and other investors in the GIGA WATT ICO White Paper are both unconscionable and illusory. The GIGA WATT White Paper purports to require agreement from the investors that, despite the investors' investments, GIGA WATT might not allocate to the investors any WTT or mining equipment at all; and even after a three-month delay has occurred, GIGA WATT still might not rescind or refund any investor's cryptocurrency investment − all while retaining the investors' invested funds and assets and while having released to themselves (*i.e.*, the GIGA WATT insiders)

_____

[4] Emphasis added, reflecting that the event triggering the GIGA WATT management team's entitlement to, and receipt of, additional tokens was the **sale** of tokens, not the post-ICO issuance of those tokens or the post-ICO distribution of Giga Watt tokens to the investors.

COMPLAINT - 21

1    additional WTT tokens merely for having procured the sale of undelivered

2    investor tokens and machinery.

3         55.    Moreover, GIGA WATT retained in its sole discretion the ability to

4    determine when, if ever, an investor token release would occur or an investor's

5    mining equipment would be set up and deployed − decisions to which investors

6    were rendered helpless and over which they had no influence.

7         56.    The onerous manner in which GIGA WATT imposed upon investors

8    its terms render the terms unfair, unconscionable, oppressive, and a contract of

9    adhesion.

10                  **Pre-Network Launch Tokens Are Securities**

11        57.    Additionally, by their very nature, tokens sold before a network

12   launch are securities, because investors purchasing those tokens are relying on the

13   technical and managerial efforts of others to affect the failure or success of the

14   enterprise.

15        58.    While pre-network launch tokens may someday have a consumptive

16   use, the fact that they have no pre-launch utility renders them almost entirely

17   dependent upon the efforts of the issuer to successfully develop and launch a

18   functional network.

19        59.    Here, Plaintiff and other Giga Watt investors were (and still are)

20   entirely dependent upon Defendants to launch the Giga Watt Project and provide

1    some valuable use to the Giga Watt tokens for which Plaintiff any other investors

2    have already provided their investment funds.

3                                **No Safe Harbor**

4        60.    The statutory safe-harbor provided for forward-looking statements

5    under certain circumstances does not apply to any of the allegedly false

6    statements pleaded in this Complaint.

7        61.    Many of the specific statements pleaded herein were not identified as

8    "forward-looking statements" when made.

9        62.    To the extent there were any forward-looking statements, there were

10   no meaningful cautionary statements identifying important factors that could

11   cause actual results to differ materially from those in the purportedly forward-

12   looking statements.

13       63.    Alternatively, to the extent the statutory safe-harbor does apply to

14   any forward-looking statements pleaded herein, Defendants are liable for those

15   false forward-looking statements because at the time each of those forward-

16   looking statements were made, the particular speaker knew that the particular

17   forward-looking statement was false or that the forward-looking statement was

18   authorized or approved by an executive officer of the defendant entities, who

19   knew those statements were false when made.

20

1    **Plaintiff's Investments in Giga Watt**

2    64.    Between June 2, 2017 and July 26, 2017, Plaintiff transmitted to

3    Defendants 3.513386 bitcoin and 322.605305 Ether as his investment in 60,282

4    Giga Watt tokens to be issued by Defendants in or about September 2017. A large

5    percentage of Plaintiff's purchase was transacted between July 17, 2017 and

6    July 26, 2017.

7    65.    In addition, between June 12, 2017 and August 21, 2017, Plaintiff

8    transmitted to Defendants 6.272 bitcoin, 4,056.28 Litecoin, and $241,890.00

9    (USD) as his investment in 129 Antminer D3 machines, 60 L3+ machines, related

10    power supplies, and deployment so those machines could be installed and hosted

11    at the Giga Watt Project's business location(s) in Washington.

12    66.    The total sum of Plaintiff's 9.785386 bitcoin, 322.605305 Ether,

13    4,056.28 Litecoin, and fiat currency invested (now being held, in one form or

14    another, by Defendants) is currently worth nearly $1,500,000.00.

15    67.    To make his investments, Plaintiff placed his purchases through the

16    Cryptonomous platform − a Singapore-based online platform through which all

17    payments for WTT tokens were collected and through which all WTT tokens

18    were to be issued and distributed by Defendants to GIGA WATT investors −

19    from Plaintiff's home in California and followed the instructions provided.

20

68.    Upon information and belief, Cryptonomous and Defendants share a common ownership interest. GIGA WATT PTE, LTD. and Cryptonomous each have their official registered place of business at the same exact office suite in Singapore. Additionally, Andrey Kuzenny − who is GIGA WATT's Chief Coordinator − is also a Co-Founder of Cryptonomous and, upon information and belief, continues to act as a principal of each of the corporate entities today.

69.    Although Plaintiff was supposed to receive his Batches 3 and 4 WTT by September 2017 and was supposed to have his 129 Antminer D3 and 60 L3+ machines up-and-running at the Giga Watt Project in the same general timeframe if not soon thereafter, no such issuance took place by those dates.

70.    On or about December 14, 2017, Defendants published on their Medium page an "Announcement Regarding Batch 4 Tokens,"[5] which stated, in pertinent part:

---

[5]https://medium.com/@gigawatt/announcement-regarding-batch-4-tokens-f669748f08b8.

**Giga Watt**
**Best Home For Your Mining**
Dec 14 · 4 min read

Dear WTT buyers,

Despite our best efforts, the delivery of the final portion of the Batch 4 WTT will fall outside the time frame of our original targeted maximum delivery date according to the whitepaper.

Batch 4 tokens that were purchased before 10pm UTC on July 24th, 2017, will be issued on 25th December, 2017.

Any WTT that were purchased after 10pm UTC on July 24th, 2017, are expected to be delayed. It is estimated that the power for these tokens will be ready by the end of February, at which time we should be able to issue your WTT. If your tokens were bought after 10pm UTC on July 24th, 2017, you are entitled to a refund of your WTT tokens in the original form of payment, and will receive the USD amount that was paid when the tokens were bought.

(emphasis added).

71.     Plaintiff has presented to Defendants numerous written demands that Plaintiff's investments in GIGA WATT be properly addressed and/or rescinded by GIGA WATT – including several demands after a 90-day delay without Plaintiff's paid-for WTT being issued to Plaintiff or Plaintiff's paid-for mining equipment and related power supplies being timely set up and deployed at the Giga Watt Project.

72.     Despite Plaintiff's repeated demand for a refund of his cryptocurrency, Defendants have failed and refused to rescind Plaintiff's investments and refund to Plaintiff the cryptocurrency Plaintiff delivered to Defendants.

COMPLAINT - 26

73.     As a result of the foregoing, Plaintiff has been damaged in an amount that will be proven at trial.

74.     Plaintiff has duly performed all of his duties and obligations, and any conditions precedent to Plaintiff bringing this action have occurred, have been performed, or else have been excused or waived.

75.     To enforce his rights, Plaintiff has retained undersigned counsel and is obligated to pay counsel a reasonable fee for its services, for which Defendants are liable as a result of their bad faith and otherwise.

**COUNT I**
**Unregistered Offer and Sale of Securities**
**In Violation of Section 12(a)(1) of the Securities Act**

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 75 above, and further alleges:

76.     Section 12(a)(1) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77*l*(a)(1)] grants Plaintiff a private right of action against any person who offers or sells a security in violation of Section 5 of the Securities Act [15 U.S.C. §§ 77e], and states that such person:

> shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

77.     Defendants, by engaging in the conduct described above, directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to actually sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

78.     Defendants are "sellers" within the meaning of the Securities Act because they or their agents solicited Plaintiff's investments in the GIGA WATT ICO.

79.     The terms of the GIGA WATT ICO called for an investment of cryptocurrency or fiat currency by Plaintiff.

80.     The funds paid by Plaintiff pursuant to the GIGA WATT ICO were pooled by Defendants with funds from other investors in an effort by Defendants to secure a profit for themselves and the investors. As a result, the investors, including Plaintiff, shared in the risks and benefits of the investment.

81.     Plaintiff relied on, and is dependent upon, the expertise and efforts of Defendants for his investment returns.

82.     Plaintiff expected that he would receive profits from his investments in Defendants' efforts.

83.     Giga Watt tokens constitute investment contracts and are therefore subject to federal securities laws, including the registration requirements promulgated thereunder.

84.     No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

85.     By reason of the foregoing, Defendants have participated in the offer and sale of unregistered securities in violation of the Securities Act.

86.     As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff has suffered damages in connection with his respective purchases of Giga Watt token securities in the GIGA WATT ICO.

**COUNT II**
**Unregistered Offer and Sale of Securities**
**In Violation of the Washington Securities Act (RCW 21.20)**

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 – 86 above, and further alleges:

87.     Section RCW 21.20.430 of the Washington State Securities Act (the "WSSA") [RCW 21.20] grants Plaintiff a private right of action against any person who offers or sells a security in violation of Section 21.20.140(1) or (2) of the WSSA, and states that such person:

> is liable to the person buying the security from him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at

1
2
3

eight percent per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security.

4      88.    Defendants, by engaging in the conduct described above, made

5   an "offer" or "offer to sell" within the meaning of the WSSA because they

6   or their agents solicited Plaintiff's investments in the GIGA WATT ICO.

7      89.    Defendants, by engaging in the conduct described above, made

8   a "sale" within the meaning of the WSSA because they or their agents

9   disposed of a security for value.

10     90.    The terms of the GIGA WATT ICO called for an investment of

11  cryptocurrency or fiat currency by Plaintiff.

12     91.    The funds paid by Plaintiff pursuant to the GIGA WATT ICO

13  were pooled by Defendants with funds from other investors in an effort by

14  Defendants to secure a profit for themselves and the investors. As a result,

15  the investors, including Plaintiff, shared in the risks and benefits of the

16  investment.

17     92.    Plaintiff relied on, and is dependent upon, the expertise and

18  efforts of Defendants for his investment returns.

19     93.    Plaintiff expected that he would receive profits from his

20  investments in Defendants' efforts.

94.    No registration statements have been filed with the SEC or the state of Washington, or have been in effect with respect to any of the offerings alleged herein.

95.    The offerings alleged herein were not exempt from registration with the state of Washington.

96.    By reason of the foregoing, Defendants have participated in the offer and sale of unregistered securities in violation of the WSSA.

97.    As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff has suffered damages in connection with his respective purchases of Giga Watt token securities in the GIGA WATT ICO.

**COUNT III**
**Rescission of Contract**

Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 97 above, and further alleges:

98.    The terms of the GIGA WATT ICO constitute a contract between Plaintiff and Defendants.

99.    The contract was entered into by and between Plaintiff and Defendants between June 1, 2017 and August 7, 2017.

100.    The terms of the GIGA WATT ICO called for an investment of cryptocurrency and fiat currency by Plaintiff.

101.   The funds paid by Plaintiff pursuant to the GIGA WATT ICO were pooled by Defendants with funds of other investors in an effort by Defendants to secure a profit for themselves and the investors. As a result, the investors, including Plaintiff, shared in the risks and benefits of the investment.

102.   Plaintiff relied on, and is dependent upon, the expertise and efforts of Defendants for his investment returns.

103.   The terms of the GIGA WATT ICO constitute an investment contract and is therefore subject to federal and state securities laws, including the registration requirements promulgated thereunder.

104.   No registration statement was filed or in effect with any federal or state regulatory body, and no exemption from registration exists with respect to the GIGA WATT ICO.

105.   Moreover, contrary to the terms of the GIGA WATT White Paper − which stated that all invested cryptocurrency would be held in escrow and would only "be released from escrow in step with the completion of facilities" − Defendants have represented to Plaintiff that, without regard to GIGA WATT's failure to have completed its facilities, virtually all of the cryptocurrency raised from investors in the ICO has been liquidated into U.S. Dollars and has been transferred from the escrow account to an operating account; and Plaintiff reasonably believes the funds raised have been dissipated, or will be dissipated,

1    before all ICO investors receive their Giga Watt tokens/mining equipment or any

2    opportunity to receive a return on their investments.

3        106.    As a result of Defendants' false representations and violation of

4    federal securities laws in connection with the GIGA WATT ICO, Plaintiff states

5    his demand that the contract between him and Defendants be rescinded and

6    canceled.

7        107.    To the extent Plaintiff has received from Defendants any benefits

8    through the contract, Plaintiff hereby offers to restore to Defendants those

9    benefits, once they are identified and can be quantified.

10       108.    As a direct and proximate cause of Defendants' conduct, Plaintiff

11   has been damaged.

12       109.    Defendant GIGA WATT, INC. is subject to liability because it

13   solicited and otherwise participated in the sale to Plaintiff of the unregistered

14   securities identified herein. Moreover, Defendant GIGA WATT, INC. is subject

15   to liability because it is believed to control, or have obtained control over, a large

16   portion of the assets invested by Plaintiff which must be disgorged and returned

17   to Plaintiff in effectuating the rescission of the contract into which he was

18   unlawfully led.

19       110.    Defendant GIGA WATT, PTE, LTD. is subject to liability

20   because it solicited and otherwise participated in the sale to Plaintiff of the

unregistered securities identified herein. Moreover, Defendant GIGA WATT, PTE, LTD. is subject to liability because it is believed to control, or have obtained control over, a large portion of the assets invested by Plaintiff which must be disgorged and returned to Plaintiff in effectuating the rescission of the contract into which he was unlawfully led.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff MARK MOSS, an individual, respectfully prays for relief as follows:

A.      An Order enjoining Defendants from making further transfers or dissipations of the investment funds and assets raised in connection with the promoted GIGA WATT ICO, or using such funds and assets in any further purchases or transactions;

B.      A judgment awarding Plaintiff equitable restitution, including, without limitation, rescission of his investments in GIGA WATT, restoration of the *status quo ante*, and return to Plaintiff all cryptocurrency or fiat currency paid to Defendants in connection with the purported ICO as a result of Defendants' unlawful and unfair business practices and conduct;

C.      An award of any and all additional damages recoverable under law – jointly and severally entered against Defendants – including but not limited to

COMPLAINT - 34

compensatory damages, punitive damages, incidental damages, and consequential damages;

  D. An Order requiring an accounting of the remaining funds and assets raised from Plaintiff in connection with the GIGA WATT ICO;

  E. An Order imposing a constructive trust over the funds and assets rightfully belonging to Plaintiff;

  F. Pre- and post-judgment interest;

  G. Attorneys' fees, expenses, and the costs of this action; and

  H. All other and further relief as this Court deems necessary, just, and proper.

## PLAINTIFF'S DEMAND FOR JURY TRIAL

  Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

COMPLAINT - 35

1        RESPECTFULLY SUBMITTED AND DATED this 19th day of March,

2    2018.

3                             TERRELL MARSHALL LAW GROUP PLLC

4                        By:   /s/ Beth E. Terrell, WSBA #26759
                             Beth E. Terrell, WSBA #26759

5

6                      By: /s/ Blythe H. Chandler, WSBA #43387
                             Blythe H. Chandler, WSBA #43387

7                      By: /s/ Brittany J. Glass, WSBA #52095
                             Brittany J. Glass, WSBA #52095

8

9                            Attorneys for Plaintiff
                             936 North 34th Street, Suite 300
                             Seattle, Washington 98103

10                           Telephone: (206) 816-6603
                             Facsimile: (206) 319-5450

11                           Email:  bterrell@terrellmarshall.com
                             Email:  bchandler@terrellmarshall.com

12

13                           David C. Silver, *pro hac vice motion*
                               *forthcoming*

14                           Jason S. Miller, *pro hac vice motion*
                               *forthcoming*
                             Attorneys for Plaintiff

15                           SILVER MILLER
                             11780 West Sample Road

16                           Coral Springs, Florida 33065
                             Telephone: (954) 516-6000

17                           Email: dsilver@silvermillerlaw.com
                             Email: jmiller@silvermillerlaw.com

18

19

20